Regiment Morning is 181785 Waverley View Investors v. United States. Good morning. May I please the court. My name is Kevin Bain and I represent Waverley View Investors. The court below here found that the government had engaged in a permanent physical taking of Waverley's property and the government does not challenge that determination on appeal. But that's a very limited finding, right? That's only with respect to and the compensation was 56,000 and it's the use of these monitoring wells. That's correct. On a particular slice of the property, correct? Yes, Your Honor. Okay. Now, the Waverley groundwater is now part of a designated Superfund site because of contamination caused by the government. That happened before all this happened, right? That's correct. What year was that? No, it is designated as a Superfund site after it was designated as part of the Superfund site after the government entered the property, drilled the wells, and discovered the contamination. The question, the central question in this case... Just to be clear, that's not in front of us. You can have a separate takings claim related to that, but those actions took place after the actions at issue in this case, correct? The physical taking in this case consists of the government's entry onto the property, drilling wells, and building a road across the middle of the property. The question, the central question in the case, whether that physical taking and the government's subsequent failure to discharge its statutory obligation to remediate the property as expeditiously as practicable has destroyed or substantially impaired the development value of the property. Now, in the court's opinion, the court seemed to think there are only two ways to look at this question. Either the government had told Waverley it may not develop, or Waverley made a calculated business decision not to proceed. What the court recognized throughout the trial, however... To proceed on what? I guess I'm a little unclear. That they had made a calculated decision not to proceed in development of the property? The court said in its opinion that Waverley had made a calculated business decision not to proceed with development. Okay. And what I would like to suggest to your honors is there's a third way to look at this evidence, and it's the way the court looked at it throughout the trial. That as a practical matter, Waverley was prevented from proceeding. Here's what the government said during trial. They, Waverley... Can I ask you, what is your position, back to Judge Moore's point? As a practical matter, Waverley didn't do it because of what? Because of this construction that had been done when government entered the property? Because the government constructed wells, built a road, and put a scarlet letter on this property saying it's contaminated. And the result of that was to totally freeze development. And the court recognized that throughout the trial. So you're using contamination as a basis, or you're just saying because the government announced the property was contaminated? Because as Judge Moore, I think, alluded to earlier, this claim isn't about the government's liability for contamination of the property. That's correct. So, but you just mentioned the scarlet letter it put on is a basis, therefore, for claiming that you're deserving these damages? Well, there was a physical taking, and that puts this case in a particular category. Now the question is, what was the damage caused by the physical taking? And what the evidence showed, and what the court said throughout the trial, was that as a practical matter, once the government came on, and made this part of a Superfund site, at that point development was frozen as a practical matter. The court said, they really can't develop or go forward as a practical matter. I mean, surely the government and the Army must understand that. And then the court said during the trial, the EPA needs to get on that property and figure out what to do. No question about that. And when the Army's project... Yeah, but I say lots of things during oral argument. Yeah, this is all the trial. This is not the opinion. Are you referring to anything in her opinion? Can you cite to any of that stuff during the opinion? No, and this is the problem. What I would like to suggest to the court is that at the close of all of the evidence at the trial, the court once again turned to the Deputy Assistant Secretary of the Army and said, the problem here is that Waverly, my client, has got a piece of property, and they can't do anything much with it until this is figured out. Now, in the court's opinion, as I said, the court seemed to view this as an either-or proposition. I'm really unclear. To the extent that you were relying on statements made by the trial judge during the proceedings as a basis for our concluding that there was an entitlement to a greater amount of damages? Not as such. What I am suggesting is that the evidence clearly demonstrates something that the court, in its ultimate opinion, didn't really focus on. The court, in its ultimate opinion, said that Waverly made a conscious, calculated business decision not to proceed with development as if it had the option of proceeding, but it chose not to. And what the evidence shows is that proceeding with development was completely impractical for a number of reasons. The most obvious reason is that Waverly is in the business of developing raw property into finished slots for sale to home builders. When the EPA came along, three developers, three home builders, were interested in purchasing this property at full market value. As soon as the EPA said, we must come on to the property, those buyers disappeared. And what the court said in its opinion is that Waverly made a calculated business decision not to proceed, even though it could have. If you think about it, that makes no sense. Why in the world would a developer choose to sit on property instead of proceeding to develop it if it was practical to do so? So are you saying that the building, this narrow strip that the government built, precluded your property? Or you're saying, as you said a few minutes ago, that by coming on the property, they painted a scarlet letter there, so that the cause for not being able to develop the property, was the wells in and of themselves, or was the scarlet letter? It's a combination. But the physical presence of the wells and the road and the continued occupation and the need to continue occupying the property for decades prevented development. What the government has said throughout this case is interesting. Back when the right of entry expired in 2014, the EPA wrote to Waverly and said, much remains to be done on this property. That work is essential, and we cannot give you an estimate of how long it will take. And then, when the right of entry expired, the government testified at trial. They put everything on hold because Waverly had brought a lawsuit. And now it tells this court, six years after entering the property, that it is unknown whether the government's actions can be made compatible with development of the property. If it's unknown whether the government's continued physical occupation of the property… But it was known that that property had been contaminated for decades, so that the entire debate is on the premise that this was the chemical warfare plant, the adjacent properties, and with all the statutes of limitations passed, no liability of the government for contamination. So I'm trying to understand just what the compensation is measured by. The compensation is measured by the difference between the value of the property before the government came along, and there's ample testimony in the record that from all the appraisers who've looked at this property, that that value is between $12 and $14 million. But that would be based on a finding that the building of these, whatever we're calling them, caused the value without them to be one thing and to be millions of dollars less with them. This is why I'm focusing on the most critical evidence in this case. That before the EPA insisted on entering the property, three national home builders wanted to buy the property at full market value. They weren't discounting it because of the fact that there was contamination on Fort Detrick, or that there were speculation that it might have seeped into the groundwater on Waverly for a very good reason. Groundwater contamination hundreds of feet below the surface has nothing to do with the developers' ability to develop the property and to build homes that aren't going to use well water, that are going to use town water. The possible existence of groundwater contamination hundreds of feet below the surface was no deterrent to three major national home builders. The deterrent to them was that if they committed to buy these lots when they were developed, they faced a problem. The EPA was going to be occupying that property, was going to be continuing to investigate, to mediate, and monitor that property for decades. What home builder in his right mind would commit to buy those lots under those circumstances? And if there's no possible home builder who would have any interest anymore, given the EPA's occupation of this property for decades, why in the world would it make any sense for Waverly to try to revise its preliminary plans to accommodate wells when it doesn't even know what additional wells the government might want to drill in the future? Is it correct that some of the property was developed, the portion more remote from the fort? I beg your pardon? I say, is it correct that some of the property was in fact developed? Phase one, which is more remote from the property, had an apartment parcel on it. And at one point, Waverly was so desperate to try to get something moving on this property that it reached a deal with Nussbaum Builders to build an apartment building, a deal which the testimony showed was the most arduous contract that Waverly had ever entered into. They had to build $4 million worth of infrastructure to commit, in order to get this apartment builder to buy the property for $5 million a couple years down the road. It was a terrible deal, but at least they could get something on one sliver of the property remote from Fort Detrick. But there was one home builder that wanted to buy all of phase one and phase two. And this is a very important point because the government relied upon a sliver of testimony from Mr. Anderson, the development manager for Waverly, to support the court's finding that Waverly made a calculated business decision not to proceed. And if I may, I'd like to explain what happened there. Waverly had a letter of intent from Stanley Homes to buy phase one and phase two. And then the EPA comes along and Mr. Anderson, as a responsible businessman, says, I can't in good conscience sign a contract with Stanley Homes without telling them the EPA is about to come onto the property, and I cannot in good faith commit to deliver this property when the EPA is going to be there. So he discloses the EPA's letter and makes a decision he had to do that. The court cites that testimony that it was my decision to disclose the EPA's interest and to say I couldn't in good conscience commit to deliver this, that led the court to say, aha, conscious, calculated business decision not to proceed. But what happened then is Waverly said to Stanley Homes, why don't you commit to buy it contingent upon the EPA's rapidly finishing its work? Stanley Homes said no, and they walked away. And at the same time, Waverly is trying to interest two other builders in phase one, the more remote part of the property, and they won't even pursue a deal on phase one because of the EPA's occupation of the property next door. Now, when the government admits that it is unknown today whether its physical occupation of the property and its future remediation activities, whether that is even compatible with development, that's a concession that we're right. The government has said they don't know today whether their future activity is going to be compatible at all with development of this property. Once the government has physically occupied and permanently taken the property, and once it is clear it is unknown whether development is compatible at all with the government's activity, that is an acknowledgment that Waverly cannot proceed and ought to be entitled to the difference between the value of this property before the government entered and the value today. What about Mr. Hale? It's my understanding that there was at least one developer that approached Waverly in 2012 after all of this and was interested in developing the property, and he had a lot of experience with contaminated sites, and that Waverly just chose not to pursue it. That's incorrect, Your Honor, and we addressed that at pages 21 and 22 of our reply brief. There was a follow-up, and the evidence is laid out in pages 20 and 21 of our brief. What was the follow-up? The follow-up was that Waverly— Wait, stop, please. I'm sorry. You said that three people wanted to buy the property beforehand and that no one would touch it afterwards, but there was evidence in this record that a Mr. Hale afterwards approached and was interested in developing the property. So I feel like your representation to the court isn't at least completely consistent with what I understand the facts to be. So what was the situation with Mr. Hale? Well, it was a very preliminary statement by a developer that has had experience taking distressed property and trying to do something with it, and so Waverly's broker contacted Hale's broker and said, if there's any interest, please contact us, and they didn't contact any further. So the damages that you're requesting are the value between uncontaminated property and the present value or the value at the time that this developer entered the contaminated property? We're looking for the value of the property as of November 2013 when the government entered the property. But it was already contaminated. Well, the contamination is an interesting question. You can have a theological debate about whether contamination or whether the entrance onto the property and the discovery of the contamination caused the problem, but the reality is that the possibility of contamination hundreds of feet below the surface in a development that was not going to use groundwater was not affecting the value of the property because knowing that possibility, three developers, three homebuilders were interested in purchasing the property at full value until they realized the EPA was going to be doing work on the property. And at that point, as I said, what homebuilder in his right mind would purchase that property? And that's the problem. Waverly's frozen. You're suggesting that the value of the property was unaffected by the known contamination nearby and potentially in the groundwater below this property, but Waverly was able to pluck this property out of bankruptcy for a minuscule amount of money post-contamination. So you're acting as though this property was worth $37 million. But what did Waverly purchase this property for? Waverly and its predecessor... No, what did Waverly purchase this property from in bankruptcy? The purchase price assigned in bankruptcy was $4 million. $4 million. So wait, so they purchased a property for $4 million post-contamination, post-knowledge of contamination in all the nearby communities, post-kids coming down with cancer in the nearby community, and they bought it for $4 million. But you're standing here in front of us telling us it was worth $37 million and that that's what the government should pay for it. Waverly has $13 million invested in this property, Your Honor, and is carrying the property at a carrying cost of over half a million dollars a year. No, Waverly doesn't. Its predecessor had $13 million invested in it. Waverly bought it for $4 million. They didn't invest $13 million in it after they bought it for $4 million. That's incorrect. Christopher Dormant is the managing member and the majority owner of this, of the entities owning this property going back to 2000 and... The fact that he owned the predecessor company that went bankrupt doesn't mean that this property, at the time he purchased it for $4 million, had that that Waverly went on and paid another $13 million. Waverly's got $4 million of skin in the game and not a penny more. Anyone could have purchased that property in bankruptcy for $4 million. At the time of the Waverly acquisition of the property, it was appraised at $12.8 million. And whether or not you think Waverly got a good deal has nothing to do with this case because... You know what? My kids have gone through my husband's baseball cards recently and they are convinced this collection is worth a fortune. We all know it's only worth what somebody's willing to pay for it. Well, Your Honor, the reality is the bankruptcy proceeding has nothing to do with the fair market value of the property, and every appraiser who looked at this property agrees that the $4 million assigned in a bankruptcy proceeding has nothing to do with fair market value. Multiple appraisers, every appraiser that's looked at this has said the value of the property was about $12 to $14 million before the government came along, and the government came along after Waverly acquired the property. And how can you stand in court and in your briefs and argue to us that there's $37 million of damage that your plaintiffs are entitled to? I beg your pardon? If you're now saying the value of the property was $12 million, how can you argue at some places in this case for $37 million? No, Your Honor, we're looking for $9 million. The difference between $13 million and 2.7... You referenced the $37 million, and that's what you sued them for in the district court, right? It was a $37 million. There might have been an adamnum clause in some tort case that I was not involved in, but in this case, the evidence before the court of claims was that the difference in value between the time right before the government took it and right afterwards was $9 million. Okay, we're well into our rebuttal. Let me restore some time right here from the government. Good morning, my name is Erica Kranz for the United States. Waverly had the full opportunity to present evidence of its view of this taking, and the Court of Federal Claims rejected the view... So their theory seems to be, at least as I understand your friend here, is that what caused the property to not be saleable was the government's action of coming in, as opposed to, one could argue, the fact that this was near a surplus site, a superfund site, and that raises certain questions. So what's your response to that? Well, first, something that we've already been talking about a little bit this morning. I think if you're going to look at one document in this record, I want it to be at Appendix 4102, which is the public presentation from 1997 projecting that this plume extended onto Waverly's land. The idea that a buyer at that time, or in intervening years between 1997 and when Waverly bought the property in 2012, or at any time past then, would have expected that there would never be any government activities on this property to investigate and possibly remediate this contamination, that's just not reasonable. Well, but wait, they introduced evidence that in 2013, three different developers were interested in the property. That's right, and the Court of Federal Claims... Didn't discuss that evidence. No, she did discuss that, and her view was... In her opinion, it's discussed? I believe so. Okay, I can point you to where, that'd be great. Sorry, I don't have that site right in front of me, but her interpretation of that evidence is that Waverly failed to connect the dots between these buyers having some interest, deals not being consummated, and the complained of activity here, which is not the contamination on this site. It's not the contamination of the site next door on the government property. It's the wells. She said you didn't connect the dots, and they haven't identified clear error. But I'd like... You believe that she discussed Stanley Martin, S.C. Bodner Company, and Cohen Companies in her opinion and offered an explanation for why that evidence didn't establish a market value in 2013 for the property? I'm sorry, I don't have a site for that. I'm not sure she did by name, but she did conclude that it appears that Waverly made a calculated decision to stop marketing this property based on its assumption that the government was going to buy the property. That assumption, as it turns out, was not well-founded. It doesn't appear to have been based on anything the government actually said, that the government was going to buy this property. It appears to be based on Waverly's own hopes of what would happen, and they were putting a lot of money into lobbying to try to make that happen. But the government has not occupied 100% of this property, and there is no right takings claim for any future occupation. But certainly there can be a stigma claim. If the government announces that we've taken over this property for wells, but we believe the contamination extends under the entire property, the minute the government makes such a statement, it is definitely stigmatizing development on the rest of the property. I sure don't want to build a house and raise my children on top of groundwater contaminated with stuff that gives people cancer. Well, a couple of things. First, the government has not taken over this property. Even during the right of entry, the government activities not exclude Waverly. The fact that there are wells out there today does not prevent, as a practical matter, Waverly from developing this property. There's testimony in the record. No, but their argument is that it stigmatized the property such that nobody would ever develop that property given the articulated contamination under it. And they're saying the presence of the wells is sort of an over-visual sign. I mean, look, somebody can walk down the street and they don't look so damaged, but if now they're walking on crutches and they've got bandages, they look a little worse for wear. Well, and here's the problem, though. First, the court rejected that idea. And secondly, a couple things. Yes, but I don't know why the court rejected that idea. Well, for one thing, there's a lot of testimony about other developments that have gone ahead with monitoring wells just like this. Well, it's a long court of claims opinion, but she does make findings that whatever stigma may have attached to the Waverly View property, it predated WVI's ownership and the government's taking of certain portions of the property in 2014. So I see that she's made those findings in several places in her opinion, like at 82 through 86. Is that what you're referring to? Right, and some of that is with regard to the Phase I development across the street. But I think the same applies. The idea that what would phase purchasers or other developers is not the cancer cluster and the contamination in private wells and the newspaper articles and the Kristin Renée Foundation and all these periodic meetings, public meetings by the Army where they are sharing their information and their projections of contamination on private property. It's not all of that stuff. It's just these wells that are part of the ultimate cleanup. So did all of that other stuff predate? Yes, Waverly's ownership, yes. And in the court of federal claims opinion, and I'm sorry I don't have a page number for you, but she walks through all of the information that Waverly would have had before purchasing the property. They bought into this uncertainty about both the extent of contamination and the possibility of future government action. There is testimony about several other Army facilities or instances of Army contamination where there is cleanup going on alongside, next door to, within development, monitoring wells that are flush with the ground, that are so unobtrusive, they're hard to locate. There's also testimony that if there are particular wells that are an impediment to development here, the Army can accommodate that. The Army is used to working in existing developments or with entities that are wanting to develop and locating wells so that everybody can work together here. That testimony is in the appendix at 665, 666, 724, 725, and 1829, and 1830. And the examples of other sites are at appendix 661 through 665. If there's a portion of the blue brief, I'd say 21 to 30, and then the conclusion, that seems to be devoted to understanding or interpreting the right of entry as expressly reserving the right to bring a takings claim. I don't see how that affects the stigma claim, so let's just put that aside for these purposes. The only thing I can think of that that would affect is really just the property which ended up being valued permanently at $56,000. It would affect whether or not a taking could have been alleged on that property as of the day the right of entry began. That's right. So basically two years of additional use of a property whose permanent value was assessed at $56,000, or maybe the interest. But we're talking about $1,000 or a couple thousand bucks at most. Is that right? Is that argument? That's right. I couldn't see how that argument helped at all in the stigma scenario because the stigma scenario is entirely fact-based on different issues. But that would be the only thing I could see affected by the contractual interpretation of the right of entry was possibly a couple of thousand dollars of damages for the space. I think that's the correct way to view it. My sense is that what they would like to do is have you have the date of taking earlier so that, in their view, before the government monitoring, this was a clean site, and after the monitoring, oh, now it's a contaminated site. And, of course, for all the reasons that we've already talked about, that is not an appropriate view of the before commission. I see. So if I were to understand the right of entry as reserving the right to allege a taking occurred the day you entered and not actually giving you permission to enter but sort of you're entering under my protest kind of thing. That's their argument. If I were to interpret it that way, that would change the nature of the factual record in terms of what? What would that change? Again, our interpretation is it would only change the date of taking, but we do not agree, of course, with that interpretation of the reservation or their argument that the grant of access is invalid. For that reservation to essentially also allow a taking, that would eviscerate the agreement. You can't have both consent for entry and a taking. They had no choice. The government told them, we can come in with or without your permission, and if you don't give us permission, you can be on the hook for all of the liability that inures from our having contaminated your property. And so they said, well, we don't want you to come in. And you tried to add into the contract, you are fully and voluntarily letting us enter. And they said, but we're not fully and voluntarily letting you enter. So, no, you can't put that in this agreement. In fact, we want to reserve our right to assert a takings claim for your coming onto our property. I mean, that's how I read it and understand the facts of this case. But I just don't know that that makes any darn difference. Right. And, again, I don't think it makes much difference at all. I think the only difference would be the date of taking, but the court already found a permanent taking. So it's not as though it's a taking for a term of years where the longer it's in place, the more compensation would be required. It's already a permanent taking.  but I do want to push back about the idea that they entered this under duress because to show duress for a contract, it's not just that it's involuntary, it's also that they truly had no other choice. They made perfectly clear that they knew they had another choice. They'd been saying no for a long time before they finally agreed to sign this. What happened when the agreement expired? Did the government try to negotiate and they said no to that? I think I recall seeing that there was an effort, but I don't remember. So the government did try to negotiate for an extension. They said no, and we have not reentered the property since then. The Army has a policy of really working with landowners and does not want to enter a property without agreement. But the third element, it's not just that they had no other choice, which Judge Moore, you suggested that, in your view, maybe they did have no other choice. They have to have no other choice because the government did something wrongful. And all the government did here was explain the circular statute. Regardless of whether there's duress or not, I can still, as a matter of contract interpretation, which is a question of law, read the reservation of the right to bring a takings claim as applying to your current entry. You may enter my property subject to your understanding that I may assert a takings claim for the fact that you've entered my property. And our reading, our interpretation of- That doesn't require duress or bad faith or anything else. Right, they have a couple of different arguments. So our position is that reading the reservation that broadly essentially eviscerates the consent in this agreement, and you can't have a better reading, in our view, would be to read that reservation more narrowly. Why shouldn't you have to compensate them? You had a major leak of deadly material on a property that is controlled by the government that is adjacent to their property. You are concerned that the leak has affected their property. You need to go in and install wells. This isn't a matter of somebody just going in and taking a look. You have to install wells. You have to build a road through the middle of it. Why shouldn't that be compensable? You have potentially, whether you did or not, potentially damaged someone else's property and the only way you can figure out the extent of the damage is to go on to that property and to use it during that time. Why shouldn't that be a compensable event? Well, and to be clear, the Court of Federal Claims found it was compensable and found that there was a taking of the area of those wells, the road, and a buffer around the wells. We did not appeal that decision, and compensation will be paid. So the answer to your question is basically yes. I mean, the Court found it was a taking, and if the United States needs to reenter this property, if Waverly chooses not to give consent, if the United States again enters the property and Waverly files a takings claim, at that point a court would have enough information to assess whether that new occupation amounted to a taking. But right now, all there is, as the Court of Federal Claims put it, is these wells. And a road. And a road, and as the Court put it, a buffer around the wells. And the Court's approach to valuing that taking was reasonable. She looked at all of the evidence, and that was a reasonable approach. They haven't shown clear error. Who ascribed that value to it? Was that value contested? I know, obviously, they were asking for $9 million, so they were asking for a great deal more than that. But with respect to the actual numbers, was that their proposal or your proposal? It's a little bit complicated. The square footage number, the price per square foot that the court settled on was essentially Waverly's number. The parties did contest the number of square feet that was the taking. And the court ultimately used Waverly's number using that 25-foot buffer. The United States admitted that it didn't need that much space. That really, if indeed it needed to, if these wells were a permanent taking, which of course we argued for that it wasn't, that we didn't need them at all, that really the United States needed a much smaller area. So are these wells still in operation? Is that 56,000, is that in perpetuity or up to the date of filing or what? That's in perpetuity, that's for a permanent taking. The wells are still there. The United States has not revisited them since. Is the cleanup continuing? Yes, there's a pilot project where the Army is going to be testing a couple methods for cleaning this site up. That's going to be taking place fully on Army property on the other side of the fence, and that's about to start. So cleanup is, things take time, and it's underway. Well, you found there's contamination under their land. How do you clean that up? Well, these things are hydrologically connected, so the idea, they're going to see anyway if they can do this cleanup fully from Army land. So inevitably that would require having to go back to those wells. That's okay because you now own them, but it would require going back to those wells and testing to see if it was successful. Potentially, and again, if those wells are in locations that truly interfere with the development plans, the undisputed testimony at trial is that the Army can and will work with Waverly to move or remove any wells that it needs to. We ask that you affirm. Thank you. Restore two minutes of rebuttal, sir. When the right of entry expired, Waverly offered to extend it if the government would simply stipulate that that would not waive Waverly's rights in this takings case, and the government would not so stipulate. That's why the right of entry was not renewed. If the government would have simply stipulated that renewing the right of entry didn't waive our existing takings claim, we would have signed it. That's the evidence. Counsel, my friend referred to this calculated business decision not to try to sell and market the property anymore, but instead to focus all efforts exclusively on selling it to the government, and this is what the court cited in support of its decision that Waverly made a calculated business decision not to try to develop. Mr. Dormant, the managing manager, made a reference in a letter to shareholders of an opportunity in crisis by which he meant that maybe we can sell the property to the government because he couldn't sell it or market it to a private developer. The whole reason he referred to it as an opportunity in crisis was because the crisis was that there was no home builder who would buy it, but maybe there was an opportunity to salvage something by selling it to the government. That doesn't show a calculated business decision not to try to market it to private home builders. In fact, at the very same time that Mr. Dormant referred to this opportunity in crisis, they were negotiating the deal with the Cohen companies, a deal that also fell apart because of perception issues arising out of the EPA's occupation of the property. My friend says there's a policy of working with developers. The court found there was no such policy. At the appendix, at page 297, during the trial said, we have learned there is no such policy, and in her opinion, At appendix 84, the court said the court does not view the government's testimony as evidencing a policy mandating the Army or the EPA to accommodate development. That's the evidence. And at trial, the court ridiculed the suggestion that somehow Waverly was obligated to go to the government and try to figure out how to accommodate the government's plans when the government didn't know what its plans were. But here's what we do know. We know the following, that the Army's project manager, Mr. Gortfit, testified that he had identified six locations where he wanted to drill additional wells to define the contours of this migrating plume. We know that any remedy would take decades to implement, and we know that any remedy will have to be reevaluated every five years to determine whether it's effective, and we know that, and all the witnesses have acknowledged this, that any remedy would require on-site monitoring for 30 years or more. That is why the government told Waverly back in April of 2013, just before it came onto the property, that it would be on the property for decades. That was the testimony of Mr. Dormant, of Mr. Anderson. It is not denied by any government witness. You're way out of time. Do you have a final thought? Thank you, Your Honor. We thank both sides, and the case is submitted.